Texagon Mills, Inc. v. Commissioner.
Texagon Mills v. Commissioner
Docket No. 24464.
United States Tax Court
1951 Tax Ct. Memo LEXIS 245; 10 T.C.M. (CCH) 422; T.C.M. (RIA) 51130; May 3, 1951
*245 Walter F. Sloan, Esq., and Ferdinand Tannenbaum, Esq., for the petitioner. Sheldon V. Ekman, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion The Commissioner has determined deficiencies in petitioner's income tax, declared value excess-profits tax and excess profits tax for 1943 in the respective amounts of $1,680.28, $2,937.41 and $41,730.22. It is alleged that the Commissioner erred in disallowing portions of the deductions which the petitioner claimed for commissions paid to its sales agent and salary paid to one of its officers and also in disallowing a portion of a net loss carry-over from 1942. Findings of Fact Some of the facts have been stipulated and are so found. Petitioner is a New Jersey corporation with its principal office located at Ridgefield, New Jersey. Its returns for the year involved were filed with the collector of internal revenue for the third district of New York. Petitioner made its returns and kept its books on an accrual basis for a fiscal year ending June 30. For several years prior to petitioner's organization, August 14, 1941, one of its organizers, Aaron S. Staff, was engaged in the manufacture and *246 sale of netting, such as is used for veilings and women's clothing, under the name of Staff Textile Company. Staff began this business about 1936 under a process for which he acquired certain patents involving the use of "Raschel" machines, commonly used for manufacturing lace, instead of the bobbinet machines generally used in the manufacture of netting. The netting manufactured by Staff Textile Company was loosely put together by a series of loops and was inferior in strength and quality to the woven netting manufactured on the bobbinet machines. For that reason Staff had great difficulty in getting his netting accepted by the trade and establishing his business. Prior to 1940 he tried to arrange with several established sales agencies to handle his product but was not successful. The jobbers who examined the netting which he showed them were of the opinion that the clothing manufacturers would not accept it. Some of the merchandise which the company did succeed in selling was later returned as unsatisfactory. Some time in 1940 Staff met Richard L. Spence, president of Spence Bryson, Inc., an old and well-established sales agency which specialized in imported linens but also handled *247 nettings. Spence owned 124 of that company's 528 shares of stock. Staff was endeavoring to have Spence agree for his firm to act as sales agent for Staff Textile Company. After a series of conferences a written agreement was entered into by Spence and Staff on July 1, 1941. Pursuant to this agreement a new corporation, the petitioner, was organized to manufacture netting and like products under the patents then held or later to be acquired by Staff, and Spence Bryson, Inc., was given the exclusive sales agency for all of its products. Petitioner's capital stock consisted of 100 shares of no par value common stock, known as class A stock, and 1,000 shares of class B of the stock, par value $100 each, preferred as to assets and dividends to the extent of five cents per share each year, noncumulative. Staff transferred to petitioner the right to the exclusive use of patents which he had and all the machinery and equipment then in use at his plant at Williamsport, Pennsylvania, in exchange for 100 shares of class A stock and 35 shares of class B stock, plus $1,500 in cash. Spence Bryson, Inc., was issued 450 shares of petitioner's class B stock in exchange for certain machinery and equipment *248 which he transferred to petitioner of a value of $45,000. Staff immediately transferred 50 shares of his class A stock to Spence Bryson, Inc.
Pursuant to the agreement of July 1, 1941, and in accordance with its expressed provisions the petitioner entered into an agreement with Spence Bryson, Inc., on August 29, 1941, whereby that company agreed to act as petitioner's exclusive sales agent and was to receive 15 per cent of commissions on all sales of merchandise manufactured by petitioner. In addition to handling the sales Spence Bryson, Inc., agreed to do all of petitioner's bookkeeping and accounting. Some time after petitioner's organization Staff purchased 15 additional shares of its class B stock and transferred 25 shares of its class A stock to his wife, so that on June 30, 1943, the end of petitioner's taxable year, Staff and his wife owned together 50 shares of the class A and 50 shares of class B stock and Spence Bryson, Inc., owned 50 shares of the class A and 450 shares of the class B stock. Due to the war there was a sharp curtailment of imported nettings beginning in 1940 and continuing through the war period. As a consequence, there was a demand for the products *249 manufactured by the petitioner and petitioner was able to operate at full capacity during 1942 and 1943. Spence Bryson, Inc., spent considerable sums in advertising and promoting petitioner's products. In addition, Richard L. Spence, personally, devoted a large portion of his time to petitioner's business. He served as petitioner's president and technical adviser from the date of petitioner's organization until the close of the taxable year 1943. Because of his technical knowledge of the netting and weaving business and his mechanical skill, he succeeded in making improvements in petitioner's machines and manufacturing methods and greatly advanced the quality of its products. Staff was elected and served as petitioner's vice-president and secretary. At a meeting of petitioner's stockholders held July 1, 1942, a resolution was adopted authorizing the payment of salaries to Staff and Spence of $27,600 each for 1943 and $50,000 each for 1944. Spence also received a salary from Spence Bryson, Inc., of $13,250.25 for the calendar year 1942 and $15,562.82 for 1943. From time to time during 1941, 1942 and 1943 Spence Bryson, Inc., made loans to petitioner on its promissory notes in the *250 aggregate amount of $40,000, [1] all of which were paid off in 1943 and 1944. Pursuant to its organization agreement the petitioner during 1944 and 1945 redeemed all of its outstanding class B stock as follows: No. of
Date
Shares
Amount
2- 7-44
100
$10,000
11-24-44
200
20,000
11- 2-45
200
20,000 These stock redemptions were made from a sinking fund which petitioner set up out of profits, pursuant to the July 1, 1941, agreement. Petitioner's gross sales, the commissions paid to Spence Bryson, Inc., and net profits, before taxes, for the taxable years 1942 to 1946, inclusive, were as follows: Gross
Year
Sales
Commissions
Net Profits
1942
$ 14,262.59
$ 2,112.75
($ 10,655.97)
1943
356,649.84
53,645.04
71,302.57
1944
974,188.27
146,151.18
254,258.82
1945
1,247,376.21
187,224.38
460,754.00
1946
1,374,278.62
206,031.21
547,896.23
About 1944 or 1945 Staff began to protest the payment of 15 per cent commissions on sales and at the end *251 of 1945 stopped payment of the commissions altogether. After unsuccessful efforts to arbitrate the matter and after Spence Bryson, Inc., had brought suit against petitioner a settlement agreement was finally reached on March 12, 1948, whereby the agency contract between petitioner and Spence Bryson, Inc., was canceled in consideration for petitioner's payment to that company of $350,000 cash. Spence resigned as petitioner's president on January 1, 1949. Petitioner has had no other sales agent up to the present time. In its return for 1943, and also in its 1942 return, petitioner deducted the full amount of the commissions which it paid to Spence Bryson, Inc., as ordinary and necessary business expenses. The Commissioner in determining the deficiencies herein allowed as commissions 3 per cent of sales and disallowed the balance. The Commissioner also disallowed $12,600 of the $27,600 of salary paid to Richard L. Spence. Opinion LEMIRE, Judge: Our first question is whether the selling commissions which petitioner paid to Spence Bryson, Inc., in excess of 3 per cent of gross sales are deductible as ordinary and necessary business expenses. The Commissioner has determined that *252 the commissions were to that extent excessive and were not reasonable compensation for the services rendered by Spence Bryson, Inc. He has thus disallowed $1,684.87 of the $2,112.75 paid and deducted by the petitioner in 1942 and $42,915.64 of the $53,645.04 paid and deducted in 1943. He contends that such excessive commissions were either distributions of profits or were capital expenditures. Staff made the sales agency agreement under which petitioner operated with Spence before petitioner was organized. At that time neither Spence nor Spence Bryson, Inc., had any capital interest in Staff's business. The agreement was made at arm's length and for the mutual benefit of the parties. While the 15 per cent commissions paid under the contract would have been high according to the standards of the trade for sales services alone, Spence Bryson, Inc., performed other services for petitioner. It kept the petitioner's books and did all of its accounting work. The evidence is, too, that petitioner's products were not well known to the trade and that Staff had had considerable difficulty in disposing of them. Spence Bryson, Inc., was put to considerable expense in advertising and promoting *253 petitioner's products. We have no means of evaluating, precisely, the services which Spence Bryson, Inc., rendered petitioner, other than those commonly performed by sales agents, but we do not think that is required. It is enough, we believe, that the commissions were paid pursuant to an arm's length agreement which was entered into before there was any thought of distribution of profits, or any profits to be distributed, and, so far as the evidence shows, without any collusiveness or any consideration of the tax consequences. Conceding that Spence may have driven a hard bargain with Staff, we can not say that it was not for his and petitioner's best interest and was not the only plan under which petitioner could ever have come into successful operation. Apparently, the large volume of petitioner's gross sales and the consequent large amount of commissions resulted from the wartime demand for petitioner's products. The petitioner was powerless to modify the sales agency contract to meet those conditions even if it had desired to do so. We think that the Commissioner erred in not allowing the full amount of the commissions accrued and paid by the petitioner in 1942 and 1943. *254 The year 1942 is before us only for the purpose of determining the amount of the net less carry-over to the taxable year 1943. The remaining issue is the reasonableness of the salary which the petitioner paid to Richard L. Spence in 1943. The Commissioner has determined that a reasonable allowance for his services in that year is not more than $15,000. Spence was paid a salary of $27,600 for his part-time services. This was the same amount that Staff received for his full-time services. During 1943 Spence also served as president of Spence Bryson, Inc., for which he received a salary of $15,562.82. We have no evidence as to the division of his time between the two companies, although there is evidence that he performed valuable services for the petitioner, particularly in improving its manufacturing methods and the quality of its products. We do not think there is sufficient evidence, however, to overcome the correctness of the Commissioner's determination that the $15,000 which he has allowed was reasonable compensation for Spence's services. In the absence of extraordinary circumstances it would seem to us that a salary of that amount should be adequate for the part-time services *255 of even a valuable officer. The evidence indicates that the payment of the large amount to Spence may have been based on considerations other than the personal services performed by him. It was through Spence that his firm agreed to give petitioner the financial aid that it required and to promote petitioner's products through its established sales agency. Neither of these factors should be considered in determining what is reasonable compensation for the personal services actually rendered by Spence, to which the compensation of officers is limited by the statute, section 23 (a) (1) (A), Internal Revenue Code. On the evidence of record we sustain the Commissioner's determination with respect to the salary allowance. Decision will be entered under Rule 50. Footnotes
1. The stipulation of facts gives the aggregate amount as $35,000, although the four notes therein described total $40,000. See paragraph 10 of the stipulation of facts.↩